UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------X

UNITED STATES OF AMERICA,

       -v-

SEVINJ TAGHIYEVA,

             Ind. No. 12 Cr. 626 (SJ)

          *Defendant*,

--------------------------------------------------------X


**MEMORANDUM IN SUPPORT OF
SEVINJ TAGHIYEVA'S APPLICATION FOR
<u>RELEASE ON BAIL PENDING TRIAL</u>**

Sarita Kedia
Sarita Kedia Law Offices, P.C.
5 East 22nd Street, Suite 7B
New York, New York  10010
(212) 681-0202

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------X

UNITED STATES OF AMERICA,

       -v-

SEVINJ TAGHIYEVA,

          Ind. No. 12 Cr. 626 (SJ)

          *Defendant*,

-------------------------------------------------------X

## MEMORANDUM IN SUPPORT OF
## SEVINJ TAGHIYEVA'S APPLICATION FOR
## <u>RELEASE ON BAIL PENDING TRIAL</u>

### <u>PRELIMINARY STATEMENT</u>

This memorandum is respectfully submitted in support of Sevinj Taghiyeva's application for bail pending trial pursuant to 18 U.S.C. § 3142.[1]   Ms. Taghiyeva, now 32 years old, comes before this Court with no criminal history.   And as a review of the charges against Ms. Taghiyeva reveals, this case is not one which calls for presumptive detention under the provisions of the Bail Reform Act.  <u>See</u> 18 U.S.C. § 3142(e).  Thus, Ms. Taghiyeva comes before this Court both ***presumptively innocent*** and ***presumptively eligible for release on bail***. Accordingly, for the reasons discussed below, the Bail Reform Act requires Ms. Taghiyeva's release at this pretrial juncture.  <u>See</u> <u>United States v. Sabhnani</u>, 493 F.3d 63, 75 (2d Cir. 2007).

---

[1]  We respectfully submit this memorandum in anticipation of the government's arguments at the bail hearing based on its arguments before the magistrate judge in the Southern District of Texas ("SDTX") following Ms. Taghiyeva's October 3, 2012, arrest in that jurisdiction.  The matter was referred to this Court by the Honorable Sterling Johnson.

I.      **MS. TAGHIYEVA'S BACKGROUND AND CHARACTER**

Born in Baku, Azerbaijan, Sevinj Taghiyeva (Seva) has resided in the United States since 2009, when she was 29 years old.  She has one sibling, a 28 year old brother, who resides in Baku, along with her mother and her child, now 10 years old.  At a young age, Seva was wedded to her ex-husband as the result of an arranged marriage.  A short time later, however, she was divorced and raised her son with the help of her mother.

Because Seva wanted to make a better life for herself and her young son and to liberate herself from the stigma of divorce that she felt in Azerbaijan, she decided to "pursue the American dream" and study in the United States.  She had already received a Master of Arts in Technology and Design from the Azerbaijan State Economic University.  She applied for and obtained an F-1 student visa through the University of Houston's Language and Culture Center, where she studied English for foreign language speakers.[2]  Enrolled on a full-time basis over the course of three semesters, Seva proved herself to be a hard worker and an excellent student. After completing several courses offered by the English program, Seva applied to and was admitted into the Master of Science in Supply Chain and Logistics Technology program at the University of Houston in the Spring of 2011.

In order to assist in paying for her educational and living costs, Seva had also begun looking for a job.  During her search, she learned of an opening at ARC Electronics, Inc., and she was offered a position in early 2011.  In order that she could work full time and continue her

_____

[2] An F-1 visa is a non-immigrant student visa that allows foreigners to pursue academic studies or language training in the United States.

studies on a part time basis, Seva applied for an H-1B work visa for which she was approved.[3] She then began working at ARC in May of 2011, more than two and a half years into the alleged four year long scheme charged in the indictment. At the time of the indictment, Seva was earning an annual salary of approximately $42,000. She simultaneously pursued her master's degree at the University of Houston.

During the three years Seva has resided in this country, she has formed extraordinarily strong ties in her community. Some 30 people residing in the Houston area have written letters on her behalf attesting to her wonderful character. See Ex. A. Approximately 21 people were present when she was brought to court in Houston, many of them over the course of several days. Seva also has ties in Brooklyn and is willing and able to reside in the Eastern District of New York during the pendency of her case. As discussed more fully below, several of Seva's friends, both in Houston and Brooklyn, have offered to act as sureties on her behalf.

The letters submitted in her support uniformly depict Seva as a person to be admired. Not only has she vigorously pursued her education since her arrival in this country, for the last year, she has simultaneously been working a full-time job and doing volunteer work whenever possible. Soon after her arrival in 2009, Seva joined a non-profit organization known as The Art of Living Foundation, which is dedicated to teaching people how to achieve peace and tranquility and to improve the quality of their own lives as well as the quality of society as a whole. The organization is involved in peace efforts in many conflict-affected countries throughout the world. Through this foundation, Seva met many of the women in Houston to whom she has become exceedingly close, including two of the three who have offered to act as

_____

[3] The H-1B visa is a non-immigrant visa in the United States. It allows domestic employers to temporarily employ foreign workers.

sureties.  In their letters, the people with whom Seva has so strongly bonded in the three years

that she has resided here describe their admiration, appreciation and respect for Seva.  Indeed,

the letters vividly portray a person who is "honest," "loving," "worthy," "dear," "always willing

to help others" and a "good human with high moral principles."  Id.

## II.    THE CHARGES AND THE EVIDENCE

Seva's employer, ARC Electronics, Inc., was a business engaged in the export of

microelectronics and other high-tech products.  The government claims that ARC exported these

products to Russia for use by Russian military and intelligence agencies.  Seva, an employee of

ARC from May 2011 until her indictment last month, stands charged with one count of

conspiring to violate the United States export laws (Count 2) as well as three substantive counts

of violating these laws (Counts 18, 19, 20).  See Ind. 12 Cr. 626.  Specifically, she is alleged to

have, as part of her employment at ARC, exported and conspired to export microelectronics to

Russia without the company obtaining proper authorization from the United States.

Additionally, the conspiracy count charges that Seva conspired to defraud certain suppliers into

selling goods that ARC was not authorized to purchase by providing false information to them

regarding ARC's export function and false end user information.

The evidence of Seva's involvement in the crimes alleged is, at best, extraordinarily thin.

After more than two years of investigation, including more than a year of eavesdropping on

telephones of ARC personnel and at ARC's offices,[4] the government has proffered the following

with respect to the export laws violations as to Seva.

---

[4]  The government has yet to provide any discovery other than that submitted in support of its detention application.

**A.  An Email Exchange Referring to Items Being "Export Restricted"**

The government has produced an e-mail chain showing that, in August of 2011, Seva ordered by e-mail certain computer parts (in particular, analog-to-digital converters) from one of ARC's vendors.  See Ex. B.  According to the government, ARC was not permitted to export these parts to Russia without governmental authorization.  The e-mail chain shows that the vendor at issue – Digi-Key – made "changes" to the order that was submitted by Seva and other ARC personnel, to which Seva responded that she "cancelled [her] line," meaning that she cancelled her portion of the order.  Id.  When asked by the Digi-Key employee, "Which line did you cancel?" Seva responded, "LTC2209IUP#PBF – 7 pcs – export restricted."  Id.  Thereafter, Seva ordered this part from another ARC vendor, Nu Horizons, which apparently sold the part to ARC without objection and without any statements regarding "export restrictions."  See Ex. C. The government argues that this sequence of events, as well as Seva's "own words in the email," show that Seva knowingly and intentionally ordered parts she knew to be "export restricted" in violation of United States export regulations.  T2. 144.[5]

But the government's proof is easily countered in several ways.  *First*, evidence proffered by the government in support of its motion to detain the owner of ARC, Alexander Fishenko, shows that, as recently as March 23, 2012, Fishenko "coach[ed] … the employees of the Russian companies to provide information that was sanitized, so to speak of a military use" so that ARC's "employees would not receive … emails and the like that had any military-type references."  T1. 49-51, 103-04; see also Ex. D.  Indeed, the government's proof evidences that

[5] "T1" refers to the Transcript of Proceedings held before Magistrate Judge Hanks in the Southern District of Texas on October 10, 2012.  "T2" refers to the Transcript of Proceedings held on October 11, 2012.   These transcripts are annexed hereto as Ex. L and Ex. M respectively.

Mr. Fishenko directed others to conceal information from his employees "so they wouldn't know" that export laws were being violated.  T1. 104; Ex. D.  To be sure, the government has conceded that its evidence shows that "Mr. Fishenko [wa]s trying to create a situation" where "the employees were lied to about the end users by the clients in Russia."  T1. 114-15.  Of course, if employees like Seva were part of the conspiracy to violate the export laws, there would have been no need to "sanitize" the information that they were given or to lie to them about the end user of the parts being exported.  Thus, these e-mails suggest that ARC employees, including Seva, were not aware of unlawful export activities by ARC through at least the Spring of 2012 – long after the August 2011 e-mail exchange upon which the government relies.

*Second*, although the government argues that Seva's "own words in the email" show that she knew that "a particular part had been canceled … due to export restrictions" (T2. 144), a review of the attachment sent by Digi-Key (a document produced by the government only yesterday at defense counsel's request) shows that "export restrictions" were not Seva's words at all.  Rather, in an e-mail response to the order placed by ARC, the Digi-Key employee noted "changes" to the order.  In particular, she noted that the part at issue was "removed from order due to export restrictions."  See Ex. E.  Seva then responded that she had "cancelled [her] line."  See Ex. B.  To clarify, Digi-Key then asked which line in the order she had cancelled, to which Seva replied that it was the line that Digi-Key had removed due to "export restrictions."  See id.

*Third*, an additional document produced by the government yesterday at defense counsel's request shows that, prior to ordering seven (7) pieces of this item from Digi-Key on August 10, 2011, Seva had previously ordered eight (8) pieces of this item from a company called Newark Electronics.  See Ex. F.  It appears from the e-mail that Seva had ordered these

items online from Newark's website.  On August 9, 2011, the day before Seva ordered the (7)

pieces of this item from Digi-Key, ARC had received from Newark only one (1) piece of the

eight (8) she had ordered and the remaining seven (7) pieces she needed were on "backorder

until December."  Id.  As to these items, including the one (1) piece ARC received, there was no

indication by Newark that these items could not be sold to ARC due to export restrictions.  Id.

Unable to obtain the additional seven (7) pieces from Newark expeditiously, Seva then

cancelled the remaining seven (7) pieces of the order with Newark and the following day ordered

these items from Digi-Key.  When Digi-Key was also unable to supply them, she then contacted

yet another vendor, Nu Horizons, which appears also to have sent the items to ARC without any

reference to "export restrictions."  See Ex. C.

*Fourth*, the government has conceded that in the email in which Seva says that she

"cancelled [her] line," her line being the one that reads "LTC2209IUP#PBF – 7 pcs – export

restricted," the term "restricted" did not necessarily mean "restricted" by the **United States**

**government**.  Rather, according to the FBI agent who testified at the proceedings in Houston, the

term "restricted" meant restrictions were "***[p]resumably either Digi-Key's [the vendor] or the***

***Government's***."  T1. 117.  Given the fact that Seva had no difficulty obtaining this part from

Newark and Nu Horizons, the most logical conclusion is that, to one in Seva's position (a person

who at that time had no training in United States export regulations), Digi-Key's notation that the

items were "removed from order due to export restrictions" meant that they were ***restricted by***

***the vendor Digi-Key*** and ***not*** by the **United States government**.

To be sure, this is precisely what Seva told interrogating agents upon her arrest:

"Taghiyeva re-ordered [a] part that one vendor [Digi-Key] refused to provide to ARC from

another vendor not because she was trying to circumvent [United States] export restrictions, but because … Digi-Key sometimes refused to provide parts to ARC…. Taghiyeva thought that Digi-Key had an ***internal policy*** of not sending certain parts to Russia." <u>See</u> FD-302 dated Oct. 9, 2012, Ex. G. Thus, the fact that an item was categorized to be "export restricted" by a particular vendor did not necessarily mean that the United States government restricted the export of this item. Indeed, two other vendors – Newark and Nu Horizons – sold the very item at issue to ARC without any such reference.

*Fifth*, the government argues that an ARC invoice from August 12, 2011, shows that Seva, knowing that this part was export restricted, falsely classified it as unrestricted for export. T2.144. Specifically, an invoice on which Seva's company e-mail address appears at the bottom bears the mark "ECCN EAR99" which, according to the government, means that the parts included in the order are not export restricted. <u>Id.</u>; <u>see</u> Ex. H. But the government's argument is defeated in two ways: (1) if, as we contend, Seva had not at that time been trained in export restrictions and did not believe these parts to be restricted from export to Russia under United States laws, then certainly a marking showing that the items were not export restricted is not knowingly false; rather, it comports with that belief; and (2) the shipping information on the invoices, including the marking "ECCN EAR 99," the Fed Ex number and the weight and dimensions of the package, was generally not provided by Seva, but by a logistics manager or shipping clerk. Thus, the government has no basis for stating that Seva was responsible for including this notation on the document, let alone that she knowingly falsified the document. <u>See</u> <u>id.</u>

Accordingly, the government's evidence that Seva's purchase and export of these analog-to-digital converters in August of 2011 was knowingly and intentionally done in violation of United States export laws is weak at best.

## B.  Evidence of Seva's Intentional Misrepresentations to Suppliers

The government additionally argues that Seva "flat out admitted" that she would lie to suppliers by claiming that ARC was a "contract manufacturer," and thus she is guilty of conspiring to "defraud U.S. suppliers to obtain goods that [ARC] would not otherwise be able to purchase." T2. 145.  But Seva made no such admissions.  Indeed, when interrogated by agents upon her arrest, Seva was extremely candid, because she had not intentionally violated any laws or done anything she believed to be wrongful.  <u>See</u> Ex. G.  In fact, Seva told the agents truthfully that she did not know what a "contract manufacturer" was, and that, since her inception at the company, ARC represented itself to be a contract manufacturer and the employees therefore told vendors that that is what they were.  She candidly explained her job functions, which included working with clients, selecting vendors, placing orders and creating invoices.  <u>Id.</u>

Nevertheless, to show that Seva knew that she was misrepresenting ARC to be a contract manufacturer, the government points to a transcript of a recorded conversation between Seva and her supervisor Alexsandr Posobilov, in which Posobilov ostensibly states: "We, as a matter of fact, are lying.  We are not a contract manufacturer."  Ex. I.  But the context and timing of this conversation speak volumes regarding Seva's lack of involvement in or knowledge of any fraud or export violations by ARC or others.   In this conversation, which occurs on April 15, 2012 – *nearly a year after Seva began working at ARC* – she discusses with her supervisor Posobilov a presentation she is giving at school.  <u>Id.</u>  At the time of this conversation, Seva was pursuing her

master's degree in Supply Chain and Logistics Technology at the University of Houston. Specifically, Seva says that she selected procurement processes at ARC Electronics as a topic for her presentation and asks her supervisor Posobilov's advice. Id. She discusses ways in which ARC could improve its procurement processes, including creating a database that identifies restricted versus non-restricted parts. Id. She also states during this conversation her belief that ARC is in fact a "contract manufacturer[ ]"; that, "as contract manufacturers" they "should be working directly with end user[s]"; and that certain manufacturers are "not selling" items to ARC because they "have distributors in Russia." Id.

The very nature of the conversation demonstrates that Seva was not aware that ARC was unlawfully exporting items to Russia or defrauding suppliers. Indeed, if Seva were knowingly and intentionally involved in unlawfully procuring items for export or defrauding suppliers, surely she would not have chosen this subject matter for her school presentation, let alone discussed it with her supervisor. Therefore, this conversation actually negates the very inference the government seeks to draw.

### C. Seva's Knowledge of United States Export Laws

Finally, as evidence of her guilt, the government relies upon Seva's statement to agents at the time of her arrest that she is familiar with Export Control Classification Numbers (ECCNs). But what the typewritten narrative conveniently omits is *when* Seva learned about ECCN numbers and export restrictions. Although Seva was interrogated immediately following her arrest on October 3, 2012, this narrative was not completed until October 9, 2012, six days later. The government has not provided any handwritten or typewritten notes taken at the time Seva was questioned, nor has it provided any recording of such questioning.

As Seva informed the agents on October 3, 2012, when she began working at ARC in May of 2011, she received no training regarding United States export restrictions. In fact, it was not until several months after she began working at ARC (later in 2011 or possibly early 2012), presumably following an investigation by the Department of Commerce, that the company retained a law firm to provide its employees training in these areas.[6] Certainly, at the time of the August 2011 order upon which the government relies, Seva had received no training in this area. Notably, the government has presented no evidence to the contrary.

Thus, once again, the government's evidence is extremely thin.

## III.     THE PROPOSED BAIL PACKAGE

In order to guarantee her appearance in court, Seva asks to be released on a $100,000 personal recognizance bond, co-signed by two financially responsible sureties. The sureties proposed, Elkhan and Irana Mehdiyev, are long time family friends who have resided here in Brooklyn for more than a decade. They are both United States citizens with a nine year old son who was born here. Elkhan, a registered nurse, is currently employed as the head night nurse in the Psychiatric Department at Lutheran Medical Center, where he earns a substantial income. His wife Irana works as a home attendant and takes care of their son. Irana's parents, Irada and Eldar Aliyeva, also United States citizens who have lived in Brooklyn for the past 10 years, are willing to have Seva live with them in their home for the duration of her case.[7]

---

[6]   We have requested that the government provide evidence of any training received by ARC employees regarding export regulations but have yet to receive this information.

[7]   In the event that the Court determines that additional sureties are necessary, three close friends of Seva who reside in Houston have agreed to co-sign the bond on her behalf as well. See T2. 67-106. These individuals are also willing to have Seva reside in their homes for the duration of this case. Id.

In addition, we propose the following restrictive conditions:

(1) Home detention with electronic monitoring;

(2) Travel restricted to the EDNY and SDNY, unless permission is granted to travel elsewhere;

(3) No association with co-defendants except in the presence of counsel;

(4) Reporting to Pretrial Services as required;

(5) Surrender of passport with no applications for new travel documents;

(6) Any other condition the Court deems necessary.

To further assure the Court that Seva is not a serious flight risk, the Consular Officer at the Embassy of the Republic of Azerbaijan to the United States has provided a letter agreeing that the Embassy will not issue any new passport or other travel documents to Seva during the pendency of her case and is willing to take whatever additional steps possible to assist United States officials in keeping Seva in this country through the conclusion of her case. See Ex. J.

These restrictive conditions, we respectfully submit, together with the proposed bond, are sufficient to reasonably assure that Seva will not flee.

## ARGUMENT

## I. THE BAIL REFORM ACT FAVORS THE DEFENDANT'S RELEASE

Prior to the passage of the Bail Reform Act ("BRA"), federal law traditionally provided that all persons arrested for non-capital offenses shall be admitted to bail. Stack v. Boyle, 342 U.S. 1, 4 (1951). Only in rare circumstances would release pending trial be denied. Sellers v. United States, 89 S.Ct. 36, 38 (1968). Because "[i]n our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception," United States v.

Salerno, 481 U.S. 739, 755 (1987), the BRA requires the release of a defendant on the "***least***

***restrictive***" conditions necessary to "***reasonably assure*** the appearance of the person as required

and the safety of any other person and the community."  See 18 U.S.C. § 3142(c)(1)(B)

(emphasis added).  Thus, in seeking Seva Taghiyeva's pretrial detention, the government has

overlooked not only the plain language of the BRA which ***favors release***, but also prevailing

case law which makes clear that "it is only a '***limited group of offenders***' who should be denied

bail pending trial."  United States v. Sabhnani, 493 F.3d 63, 75 (2d Cir. 2007), quoting United

States v. Shakur, 817 F.2d 189, 195 (2d Cir. 1987) (internal citations omitted) (emphasis added).

Where, as here, detention is not presumed by virtue of the charged offense, the

government carries a dual burden.  See Sabhnani, 493 F.3d at 75.  First, it must prove by a

preponderance of the evidence that the defendant poses a serious flight risk.  Id.; see also 18

U.S.C. §§ 3142(e) and (f).  If it is able to satisfy that burden, the government must then

demonstrate that "no condition or combination of conditions" will sufficiently mitigate the risk.

See id.; Sabhnani, 493 F.3d at 75 (citing Chimurenga, 760 F.2d at 405).  The government is

unable to satisfy both prongs in this case.

## II.    SEVA'S IMMIGRATION STATUS DOES NOT PRECLUDE HER FROM RELEASE

The government's primary argument in support of its bid for detention is not the nature of

the offense charged or evidence of Seva's guilt; rather, it is her immigration status.[8]  To be sure,

at the proceedings in Houston, government counsel argued:

---

[8]  Notably, in its detention memorandum filed on October 3, 2012, the government did not advocate for Seva's detention.  See Govt. Det. Mem., Ex. K.  Thus, at the time of the indictment's unsealing, it apparently agreed that she was eligible for bond based on the evidence but changed its position based solely on her immigration status.

> I think really more importantly with respect to Ms. Taghiyeva is her status here in this country and the uncertainty of that status…. And I think that, at least for the Government's position, really changes the analysis with respect to Ms. Taghiyeva and the fact that she not only is not a U.S. citizen, but doesn't have any sort of permanent status here…. She has no permanent legal status in this country…. She will lose the visa that she is currently on because that visa is no longer valid, it couldn't be valid. And the question is will she be able – would she be able to obtain another type of visa while this case is pending…. And I think that, you know it would be probably difficult for her. I mean if the University of Houston would sponsor her again, that's a question mark. Would the Department of Homeland Security grant a new visa to someone in her position? I don't know. But I think it's uncertain at best….

T2. 117.

As noted above, Seva initially came to this country on an F-1 student visa, sponsored by the University of Houston. After completing several semesters in English language courses, Seva decided to pursue a master's degree at the university and work simultaneously. Rather than continuing on a student visa, which would have required her to attend school full-time, she chose to seek employment in order to help pay her school costs. Through an acquaintance, she learned of an opening at ARC. She was offered a position at ARC in 2011, at which point she changed her status from an F-1 student visa to an H-1B work visa. Because ARC has been indicted and Seva can no longer continue to work there, the question of her status, as the government stated, is "uncertain." Notably, however, to date, some 41 days after her arrest, ICE has not filed a detainer.[9]

In all events, though, Seva's immigration status is not determinative, as the government suggests. Indeed, as courts throughout this country have recognized, "[i]n promulgating the

---

[9] We expect that, if she is released, Seva will attempt to change her status, returning if she is able to an F-1 student visa or obtaining an H-1B visa through a different employer.

BRA, 'Congress chose **not to exclude deportable aliens from consideration for release or detention in criminal proceedings**.'" United States v. Trujillo-Alvarez, No. 12 CR 469, 2012 WL 5295854, at *5 (D.Or. Oct. 29, 2012), quoting United States v. Adomako, 150 F.Supp.2d 1302, 1304 (M.D.Fl. 2001) (emphasis added).

Rather, 18 U.S.C. § 3142(d) of the BRA addresses instances in which a defendant is not a citizen or a lawful permanent resident of the United States. Specifically, this section permits the **temporary** detention for a period of **not more than 10 days** of individuals who are not citizens or lawful permanent residents and who may flee so that the attorney for the government may "**notify … the appropriate official of the Immigration and Naturalization Service**" of defendant's arrest. Id. at § 3142(d)(2) (emphasis added). "If the official fails or declines to take such person into custody during that period, **such person shall be treated in accordance with the other provisions of this section**, notwithstanding the applicability of other provisions of law…." Id. (emphasis added); see also United States v. Xulam, 84 F.3d 441, 444 (D.C. Cir. 1996).

"When the government [has] not move[d] for temporary detention under section 3142(d), it does not seem legitimate for it to [ ] introduce the specter of a possible deportation … as a principal reason for detention." Id. In other words, where, as here, the defendant faces long-term pretrial detention, the court should evaluate, as it would in any case, the § 3142(g) factors in determining whether conditions exist that would sufficiently mitigate any flight risk. Id.

Importantly, courts throughout this country have found appropriate the release of defendants whose immigration status was invalid or questionable, even where an immigration detainer had been lodged, which has not been done here. In Xulam, for example, 84 F.3d 441, the D.C. Circuit Court of Appeals reversed the lower court's detention order where the defendant

was charged with making a false statement on his passport application.  The court below found detention appropriate based on (1) the government's representation that he might face deportation to Turkey, where as a Kurd he might be persecuted, and (2) evidence showing that the defendant had a strong commitment to advocating the cause of Kurdish rights, which was only increased by the possibility of deportation.  Id. at 442.[10]  The court below also "referred several times to the notion that if the defendant were to flee, his supervisors could not stop him."  Id. at 444.

In reversing the district court's decision, the D.C. Circuit found that release was warranted since defendant had **surrendered all passports and travel documents, making it "unlikely he could go far even if he wished to**."  Id. at 443 (emphasis added).   Additionally, the court considered that, as in this case, the defendant there (1) had no criminal record or record of failure to appear, (2) had a wide circle of respected acquaintances and close friends in the community who attested to his "spiritual" and "intellectual" integrity, and (3) posed no threat to the community.  Given these facts, the Court of Appeals concluded that pretrial detention was clearly erroneous.  Id. at 442-443.   In response to the issue of whether defendant's supervisors could prevent him from fleeing if he wanted to, the Court of Appeals observed:  "That, of course, is true of every defendant released on conditions; it is also not the standard authorized by law for determining whether pretrial detention is appropriate.  **Section 3142 speaks of conditions that will "reasonably" assure appearance, not guarantee it**."  Id. at 444 (emphasis added).

---

[10]  Notably, in Xulam, immigration authorities had lodged a detainer against defendant.

Similarly, in <u>United States v. Marinez-Patino</u>, No. 11 CR 064, 2011 WL 902466 (N.D.Ill. Mar. 14, 2011), the defendant, who had multiple prior arrests and convictions, was charged with re-entry by a removed alien.  The defendant was first convicted in 1990 of second degree murder and received a sentence of five years imprisonment.  <u>Id.</u> at *2.  Prior to the completion of his sentence, he was removed to Mexico by ICE officials.  <u>Id.</u>  After re-entering the United States without the required permission, the defendant was then arrested in 1996 for domestic battery.  <u>Id.</u>  Several years later, he was convicted of, *inter alia*, driving under the influence of alcohol and illegally possessing/transporting liquor, for which he received one year of probation and home confinement.  <u>Id.</u>  In 2010, defendant was again convicted of, *inter alia*, driving under the influence of alcohol and was sentenced to one year imprisonment.  While defendant was serving his sentence, ICE again took him into custody.  The government then decided to pursue prosecution on illegal re-entry charges.  <u>Id.</u> at *3.  It then sought detention under the BRA based on the fact that defendant was an illegal immigrant against whom ICE had lodged a detainer.  <u>Id.</u> at *1.  In particular, the government argued that, based on the ICE detainer, there was a "serious risk" that the defendant would not appear as required.  <u>Id.</u>  Rejecting the government's bid for detention, the court found that the BRA contemplated a serious risk of ***voluntarily*** flight by a defendant, not a risk of ***involuntary*** non-appearance based on the possibility of deportation.  <u>Id.</u>  Thus, the court ordered the pretrial release of the defendant.  <u>Id.</u>[11]

---

[11]  The court also noted that it did "not construe the relevant statutory and regulatory scheme to require ICE to interfere with the ability of [the United States Attorney's office] to prosecute a charged criminal offense.  <u>Id.</u> at *1.  To be sure, 8 C.F.R. § 215.3 (g) specifically instructs that the departure from the United States of "[a]ny alien who is needed in the United States … as a party to any criminal case … pending in a court in the United States" shall be deemed prejudicial to the interests of the United States.

In United States v. Chavez-Rivas, 536 F.Supp.2d 962 (E.D.Wisc. 2008), defendant was a citizen of Mexico living illegally in the United States for many years. Following a 1993 conviction for assault with a deadly weapon, for which he was sentenced to three years imprisonment, defendant was deported to Mexico prior to the completion of his sentence. He subsequently re-entered the country and married a United States citizen with whom he had children. He was never given legal status in this country, however. Subsequently, in 2004, defendant was convicted of cocaine delivery and sentenced to six years probation with one year in the county jail as a condition. The following year, he was again deported by immigration authorities. He again returned to the United States, at which time his probation was revoked and he was sentenced to 3 ½ years imprisonment. While he was serving this sentence, prison officials notified ICE.

The government then indicted defendant for illegal re-entry and argued for pretrial detention under the BRA based primarily on defendant's illegal presence in the United States and the likelihood that he would be deported by ICE if released. Id. at 964. Upon an analysis of the BRA's §3142(g) factors, the court concluded that, although the defendant's immigration status was relevant to its determination, the government had not demonstrated that no conditions could reasonably mitigate any flight risk defendant posed. Id. at 968-69. Specifically, the court found appropriate the defendant's release on a $50,000 bond secured by $10,000 cash and other conditions including home detention with electronic monitoring. Id. at 963, 969.

Likewise, in United States v. Motamedi, 767 F.2d 1403 (9th Cir. 1985), the Ninth Circuit Court of Appeals reversed a detention order where the defendant, a 27 year old Iranian citizen, was charged with exporting military items without a license in violation of the Arms Export

Control Act.  There too, when detaining the defendant, the district court's primary concern was the defendant's alienage, but the appellate court determined that this was outweighed by the defendant's ties to the community, lack of criminal record, and lack of alcohol or drug abuse.

Indeed, in numerous cases, courts have ordered the pretrial release of defendants despite their questionable or unlawful immigration status.  See, e.g., United States v. Adomako, 150 F.Supp.2d 1302 (M.D.Fl. 2001) (defendant, a deportable alien charged with making false statement in applying for a U.S. passport, granted pretrial release under Bail Reform Act despite INS detainer); United States v. Trujillo-Alvarez, No. 12 CR 469, 2012 WL 5295854 (D.Or. Oct. 29, 2012) (court found pretrial release of defendant, who had previously been convicted of drug trafficking, deported, and then charged with illegal entry, appropriate under the Bail Reform Act despite the fact that ICE had filed a detainer and thus defendant might be deported prior to trial); United States v. Montoya-Vasquez, No. 08 CR 3174, 2009 WL 103596, at *4 (D.Neb. Jan. 13, 2009) (Where defendant was charged as an illegal alien in possession of a firearm and the government moved for detention based on the possibility that ICE may deport him prior to trial as it had filed a detainer, court found defendant eligible for release as "[t]he Bail Reform Act does not permit this court to speculate on the 'risk' that a defendant would not appear in this court due to his being removed from this country by the same government that is prosecuting him."); United States v. Mendez Hernandez, 747 F.Supp. 846, 850 (D. Puerto Rico 1990) (Reversing court below's detention order, district court found detention of defendant charged with illegal re-entry (who had previously been convicted of a crime and deported) to be an "abuse in the administration of justice").

This is true even where the defendant ***entered*** this country unlawfully, which notably is not the case here. In this case, the government has not sufficiently shown that Seva poses a serious flight risk, let alone one that cannot be mitigated by appropriate release conditions. In fact, other than Seva's "uncertain" status, the government has shown nothing to indicate that she has the desire, the means, or the ability to flee. Moreover, if in fact Seva is innocent, as she is inarguably presumed to be, she did nothing to voluntarily fall out of status in this country. Thus, if in fact her status is no longer valid, it must, at this juncture, be considered a matter completely beyond her control and, accordingly, should not weigh against her release.

## III.  AN ANALYSIS OF THE 3142(g) FACTORS REVEALS THAT SEVA MUST BE RELEASED ON BAIL PENDING TRIAL

To determine whether release is required based upon the presence of sufficient conditions, the Court must consider the following factors: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the defendant; (3) the history and characteristics of the defendant; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the defendant's release. See 18 U.S.C. § 3142(g); see also Sabhnani, 493 F.3d at 75.

An analysis of these factors reveals that the government has not and cannot meet its burden to show that Seva presents a serious risk of flight that appropriate conditions of release cannot sufficiently diminish.

### A.  The Nature and Circumstances of the Offense Charged

As discussed above, Seva is not charged with a crime of violence or any offense that renders her presumptively ineligible for bail or suggests that she is a danger. Notably, several of

Seva's co-defendants who are similarly charged are released on the type of bond she requests.  In particular, Lyudmila Bagdikian, Svetalina Zagon and Anastasia Diatlova are released on bonds ranging between $100,000 and $250,000, co-signed by two sureties.  Thus, there is clearly nothing about the nature or seriousness of the charges that favors detention.  Indeed, apart from defendant Viktoria Klebanova, who is charged with more serious offenses than Seva including obstructing of justice, Seva is the only female employee of ARC who remains detained without bail.

### B.  The Weight of the Evidence

As discussed at length above, the evidence against Seva is extremely thin.  At best, Seva appears to be an unwitting participant in ARC's unlawful export activities.  The weakness of the evidence weighs heavily in Seva's favor.

### C.  Seva's History and Characteristics

Seva's history and characteristics also weigh heavily in favor of release.  As discussed above, Seva is a well-educated, productive member of society who has no criminal history.  Although Seva may not have strong family ties in the United States, it cannot be suggested that her ties to the community are anything but strong.  Indeed, at the time of her arrest, she was residing with her close friend Natalie, with whose family she has spent holidays.  She maintains numerous loving friendships in this country and is very close with her relative Mary Efendi, who resides in Houston.  Some 30 people have written letters on Seva's behalf, describing her remarkable character.  More than 20 close friends appeared on her behalf during the proceedings in Houston.  Moreover, although she has been residing in Houston throughout her time in the United States, Seva also has ties in Brooklyn.  Indeed, she has solid members of the community

who support her and are willing to co-sign a bond for her and allow her to reside in their home for the duration of the pending case.

In the face of her history, characteristics and tremendous community support, the government's sole argument that Seva's questionable status renders her a serious flight risk is simply insufficient to warrant detention.[12]

### D. The Nature and Seriousness of any Danger Posed by Seva's Release

The government has not argued, nor has it presented any evidence, that Seva poses any danger to any person or the community if released on bail. Thus, this factor also weighs in favor of release.

Accordingly, an analysis of the § 3142(g) factors demonstrates that the government is unable to meet its burden to prove that Seva poses a serious flight risk that is not sufficiently mitigated by the proposed conditions of release.

---

[12] In detaining Seva pending her appearance in this District, the magistrate judge in Texas relied on information provided by an unidentified ICE official that (1) the H-1B visa that Seva held is not "typical" and is only "given to a handful of people, maybe 50 to 60 per year" and (2) in order to change her status and receive a student visa, Seva would have to leave the country and reapply from a foreign country. T2. 157. Either the court misunderstood the representations that were made or the unidentified ICE official was entirely wrong on both scores. Indeed, 65,000 new H-1B visas may be issued per year with the number carried over from prior years. Moreover, one is able to change one's visa status without leaving the country, just as Seva did when she changed from an F-1 visa to an H-1B.

## <u>CONCLUSION</u>

In light of Seva's history and characteristics, her strong community ties, and the lack of evidence against her, we respectfully ask that the Court release Seva on a $100,000 personal recognizance bond co-signed by two sureties, together with any other conditions the Court deems appropriate.

Dated: New York, New York
November 13, 2012

Respectfully submitted,
/s/
Sarita Kedia
Sarita Kedia Law Offices, P.C.
5 East 22nd Street, Suite 7B
New York, New York  10010
(212) 681-0202